**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLORADO**

FILED
U.S. DISTRICT COURT
DISTRICT OF COLORADO

2019 MAR 19 AM 11: 11

JEFFREY P. COLWELL
CLERK

BY_____DEP. CLK

| | |
|---|---|
| HONG JIANG, an individual, | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| MERCK SHARP & DOHME CORP. | ) |
| f/k/a MERCK & CO., INC., | ) |
| Defendant. | ) |

**'19 - CV - 0 0 8 2 0**

Civil Action No.: _____

**COMPLAINT WITH JURY DEMAND**

## COMPLAINT

**COMES NOW**, Plaintiff, HONG JIANG (hereinafter "Plaintiff"), by way of this

Complaint against MERCK, SHARP & DOHME, CORP., formerly known as MERCK & CO.,

INC., (hereinafter "Merck"), to allege as follows:

### I. INTRODUCTION

1. This is an action for personal injury, statutory, compensatory, and punitive damages

due to Plaintiff as a result of Defendant's concealment of risks associated with their drug

FOSAMAX as well as its gross exaggeration of the purported fracture reduction benefits

conferred by the drug FOSAMAX, and the over promotion of the drug for non-approved, or

"off-label," indications.

### II. JURISDICTION AND VENUE

2. Venue is proper within this district as Plaintiff is a resident of El Paso County, State of

Colorado.

1

3. Jurisdiction in this action is based upon diversity of citizenship, 28 U.S.C. Section 1332 (a), and that damages exceed, exclusive of interest and costs, the sum of Seventy-five Thousand ($75,000.00) Dollars.

4. Venue lies in the District of Colorado as Plaintiff is a resident of El Paso County, State of Colorado.

## III. PARTIES

5. Plaintiff HONG JIANG is over the age of nineteen (19) and is a citizen of the State of Colorado. Plaintiff was prescribed and ingested FOSAMAX for the treatment and/or prevention of osteoporosis or osteopenia for over 5 years commencing in approximately 2000.

6. Defendant, Merck Sharp & Dohme, Corp., (hereinafter "Merck") is a corporation organized and existing under the laws of the State of New Jersey, with its principal place of business located at One Merck Drive, Whitehouse Station, NJ 08889.

7. Defendant Merck was at all relevant times authorized to and regularly conducted business in the state of Colorado.

8. At all relevant times, Defendant Merck, through its agents, servants, employees and apparent agents was the designer, manufacturer, labeler, promoter, marketer, distributor and seller of FOSAMAX, a bisphosphonate drug used primarily to prevent, mitigate or reverse the effects of osteoporosis and Paget's Disease.

9. Defendant, either directly or through its agents, apparent agents, servants or employees, at all relevant times, distributed and sold their products in the State of Colorado.

10. Defendant derives substantial revenue from pharmaceutical products used or consumed in the State of Colorado.

2

11. Defendant expected, or should have expected, that its business activities could or would have consequences within the state of Colorado.

12. Defendant placed its bisphosphonate products into the stream of worldwide commerce and interstate commerce in the United States. They did so without adequate testing and with no warning that the drug carried with it a risk of severely suppressed bone turnover, resulting stress fractures, or low-energy femoral fractures. The warnings given did not accurately reflect the risk, incidence, symptoms, scope or severity of such injuries to the consumer or physicians. The promotional activities of Defendant further diluted or minimized the warnings given with the product. They also did so without adequate instructions regarding the appropriate duration of use of their products.

## IV. SUMMARY OF THE CASE

13. Defendant, either directly or through its agents, apparent agents, servants or employees designed, manufactured, marketed, advertised, distributed and sold FOSAMAX for the treatment and prevention of osteoporosis, Paget's Disease, and other uses.

14. As a result of the defective nature of these drugs, persons who were prescribed and ingested FOSAMAX for several years, including Plaintiff, have suffered and may continue to suffer severe and permanent personal injuries, including weakened or brittle bones, multiple stress fractures, and low energy femoral fractures as a result of severely suppressed bone turnover caused by long-term bisphosphonate use.

15. Defendant concealed and continues to conceal its knowledge that FOSAMAX lacks a long-term benefit and subject users to unreasonably dangerous risks, including Plaintiff, her physicians, other consumers, and the medical community.

16. Specifically, Defendant failed to adequately inform consumers and the prescribing medical community about the well-established risks of long-term FOSAMAX use including severely suppressed bone turnover and low-energy femoral fractures.

17. Defendant failed to conduct adequate and sufficient post-marketing surveillance of FOSAMAX after they began marketing, advertising, distributing, and selling their drugs.

18. As a result of Defendant's actions and inaction, Plaintiff was injured due to her ingestion of FOSAMAX, which has caused and will continue to cause her various injuries and damages. Plaintiff accordingly seeks compensatory damages, statutory damages, and punitive damages to the extent allowed under New Jersey law.

## V. FACTUAL BACKGROUND

19. At all relevant times Defendant, MERCK was responsible for, or involved in, designing, manufacturing, marketing, advertising, distributing, and selling FOSAMAX.

20. In September 1995, the United States Food and Drug Administration ("FDA") approved Merck's compound alendronate for various uses, including the treatment of osteoporosis and Paget's Disease. Alendronate is marketed by Defendant Merck as FOSAMAX.

21. FOSAMAX falls within a class of drugs known as bisphosphonates. Other drugs within this class, such as Aredia and Zometa, are used as chemotherapy and as adjunct chemotherapy but are not indicated for the treatment of noncancerous conditions such as osteoporosis.

22. There are two classes of bisphosphonates: the N-containing (nitrogenous) and non-N-containing (non-nitrogenous) bisphosphonates. The nitrogenous bisphosphonate include the following: paxnidronate (Aredia); ibandronate (Boniva); risedronate (ACTONEL) and alendronate (FOSAMAX). The non-nitrogenous bisphosphonates include the following:

4

etridonate (Didronel); clodronate (Bonefos and Loron); and tiludronate (Skelid). Alendronate contains a nitrogen atom.

23. FOSAMAX works by inhibiting bone resorption and suppressing bone turnover. Bone mineralization occurs in two phases. Primary mineralization occurs while new bone is forming. Because FOSAMAX severely suppresses bone turnover, bone remodeling and primary mineralization are inhibited. Secondary mineralization of existing bone however, continues to occur. This results in an increase in the tissue mineral content of the bone which translates to an increase in bone mineral density (BMD). Increased BMD does not necessarily correspond with reduction of fracture risk. Additionally, through the bisphosphonate mechanism of action, bone becomes highly mineralized, homogenous, brittle, and more susceptible to fracture.

24. Prior to the introduction of FOSAMAX, the diagnosis of osteoporosis included clinical criteria such as prior bone fracture. Through the use of the 1990's advent of BMD-based diagnosis for osteoporosis, the number of women diagnosed with osteoporosis skyrocketed. The BMD diagnostic criteria for osteoporosis has not been proven to correspond to those women who are most at risk for fracture. Upon information and belief, due to the widespread over-prescription of anti-osteoporosis medications, including FOSAMAX, the World Health Organization is currently investigating the prudence of the using the arbitrary standard-deviation system for the BMD-based diagnosis of osteoporosis.

25. As medical researchers have concluded: "The use of surrogate endpoints such as BMD to predict fracture reduction risk should be approached with caution, as the relationship between BMD changes and fracture risk reduction with antiresorptive therapies [such as Fosamax] is uncertain." Marcus, R., et al., *Anti-Resorptive Treatment of Post-Menopausal*

*Osteoporosis: Comparison of Study Designs and Outcomes in Large Clinical Trials with Fracture as an Endpoint,* 23 Endocrine Rvws. 16-37 (2002).

26. Numerous studies have confirmed that the effects of FOSAMAX on bone continue for years after treatment is discontinued. One study showed that bone turnover was still inhibited by more than 50% five (5) years after the discontinuation of FOSAMAX therapy. Strewler, G., *Decimal Point-Osteoporosis at the 10-Year Mark,* 350 n. Engl. J. Med. 1172 (2004). Merck's own studies reveal that FOSAMAX has a half-life in bone of greater than ten (10) years.

27. Defendant knew or should have known that by inhibiting bone turnover while at the same time allowing the secondary mineralization of old bone to continue, long-term FOSAMAX therapy would result in bones becoming highly mineralized, brittle and more susceptible to fracture. This is especially true given the fact that the effects of FOSAMAX on the bone accumulate and continue for years after treatment is discontinued.

28. Defendant promoted FOSAMAX as an effective treatment for osteoporosis that significantly reduced the risk of fracture in post-menopausal women.

29. Medical researchers in the January 19, 2008, issue of the *British Medical Journal* revealed the manner in which bisphosphonates are presented to reduce fracture risk for those women who actually do have osteoporosis tends to exaggerate the actual fracture reduction benefit conferred. According to the authors, published clinical trials exaggerated the fracture-reduction benefits through the use of relative risk rather than in terms of absolute risk. As the authors state: "Impressive sounding reductions in relative risk can mask much smaller reductions in absolute risk." By using the math of "relative risk" rather than "absolute risk", the purported benefits of the drugs appear larger than they actually are in the general population. As a result,

6

billions of dollars are being spent on a drug that has questionable utility for the ultimate goal of fracture reduction.

30. Correspondingly, when examined in a clinical setting, later observational studies revealed that the FIT study exaggerated the benefit derived from alendronate therapy in reducing the risk of fracture. The 2006 ICARO study concluded that the incidence of fractures during treatment with antiresorptive agents, including FOSAMAX, in a clinical setting is considerable higher than that observed in randomized clinical trials, especially when therapy was not supplemented with calcium and vitamin D. Silvano et al., *Fracture Incidence and Characterization in Patients on Osteoporosis Treatment: The ICARO Study, 21* J. Bone and Mineral Research 1565 (2006).

31. Long term studies of the effects of bisphosphonate therapy revealed that the benefits of remaining on FOSAMAX for longer than five (5) years were limited. One study, known as the FLEX study, concluded that while women who discontinued FOSAMAX after five (5) years of therapy experienced a moderate decline in BMD, their BMD remained above baseline and they did not experience a significant increase in the number of actual fractures when compared to women who continued FOSAMAX therapy for more than five (5) years. Black et al., *Effects of Continuing or Stopping Alendronate After 5 Years of Treatment, 296* JAMA 2927 (2006). The results of this study suggested that continuing FOSAMAX therapy for more than five (5) years likely does not benefit the majority of women taking the drug. It was also observed in this study that during the later years of the study, the non-vertebral fracture rate of women on alendronate appeared to be the same or higher than during the first three (3) years of alendronate therapy, despite higher bone mineral density levels.

32. Defendant has been aware of sound scientific and medical evidence that safer alternative therapies, such as vitamin D and calcium supplements, effectively reduce the risk of non-vertebral fractures without the harmful side effects that can result from long-term bisphosphonate use. For example, results of the three-year study of the effect of calcium and vitamin D supplementation on bone density showed that women taking calcium and vitamin D supplements had significantly less total body bone loss and substantially fewer fractures compared to women in the placebo group. Hughes et al., *Effects of Calcium and Vitamin D Supplementation on Bone Density in Men and Women 65 years of Age or Older,* 337 N. Engl. J. Med. 670 (1997).

33. Despite evidence of the positive effects of vitamin D and calcium on bone health and fracture risk, along with evidence of reduced efficacy of bisphosphonates when not supplemented with vitamin D and calcium, Defendants have never done a head-to-head comparative study of treatment with bisphosphonates alone versus treatment with vitamin D and calcium alone.

34. Rather than evaluating and verifying the safety of long-term bisphosphonate use with respect to bone strength and stress fractures, Defendant Merck proposed further uses of FOSAMAX, such as FOSAMAX-D, and sought to extend the exclusivity period of FOSAMAX through 2018.

35. Over the last few years, there have been an increasing number of reports of patients suffering multiple stress fractures and low-energy femoral fractures as a result of severely suppressed bone turnover caused by long-term bisphosphonate use. Severely suppressed bone turnover from long-term bisphosphonate use has also been well recognized in the medical literature.

36. There is also evidence from at least one animal study that the severe suppression of bone turnover and bone remodeling that occurs with alendronate therapy, can result in the accumulation of microdamage in bone as well as a reduction in some of the biomechanical properties of bone. Mashiba et al., *Suppresed Bone Turnover by Bisphosphonates Increases Microdamage Acculation and Reduces Some Biomechanical Properties in Dog Rib,* 15 J. Bone and Mineral Research 613 (2000). These findings were further reflected in human studies: "Our findings raise the possibility that severe suppression of bone turnover may develop during long-term alendronate therapy, resulting in increased susceptibility to, and delayed healing of, nonspinal fractures." Odvina, Clarita V., et al., *Severely Suppressed Bone Turnover: A Potential Complication of Alendronate Therapy,* 90 J. Clin. Endocrinol. Metab. 1294-1301 (2005).

37. On January 7, 2008, the FDA issued a medical advisory warning doctors and bisphosphonate patients of the "possibility of severe and sometimes incapacitating bone, joint, and/or muscle pain," and advising physicians to discontinue prescribing bisphosphonates if such complaints occurred during therapy. One week later, the January 15, 2008, *Journal of Rheumatology* article concluding that FOSAMAX patients have a 287% higher chance of developing osteonecrosis of the jaw than those not taking the drug.

38. Despite its knowledge of this dangerous side effect than can result from long-bisphosphonate use, Defendant refuses to warn patients, physicians and the medical community about the risk of severely suppressed bone turnover. Defendant has continued to defend bisphosphonates, mislead physicians and the public, and minimize unfavorable findings.

39. Consumers, including Plaintiff, who have used bisphosphonates for treatment of osteoporosis, have several alternative safer products available to treat the conditions and have not

9

been adequately warned about the significant risks and lack of benefits associated with long-term bisphosphonate therapy.

40. Defendant knew of the significant risk of severely suppressed bone turnover, brittle bones, multiple stress fractures and low-energy femoral fractures that could result from long-term bisphosphonate use, but Defendant did not adequately and sufficiently warn consumers including Plaintiff, her physicians or the medical community, of such risks.

41. As a direct result, Plaintiff was prescribed FOSAMAX for the treatment and/or prevention of osteoporosis or osteopenia and has been permanently and severely injured, having suffered serious consequences from long-term use. Plaintiff requires, and will in the future require ongoing medical care and treatment as a result of her injures.

42. Plaintiff has suffered from mental anguish from the knowledge that she will have life-long complications as a result of the injuries she sustained from the use of FOSAMAX.

43. Plaintiff used FOSAMAX as prescribed and in a foreseeable manner consistently for more than five (5) years preceding the date of her femur fracture injury.

44. As a direct and proximate result of her long-term bisphosphonate use, Plaintiff suffered severely suppressed bone turnover and sustained a fracture to her left femur on or about March 22, 2017.

45. Plaintiff, as a direct and proximate result of long-term bisphosphonate use, suffered severe mental and physical pain and suffering and has sustained permanent injuries and emotional distress.

46. Plaintiff used FOSAMAX which had been provided to her in a condition that was substantially the same as the condition in which it was manufactured and sold.

47. Plaintiff would hot have used and her physician likely would never have prescribed FOSAMAX for so many years had Defendant properly disclosed the risks associated with long-term use.

48. Defendant, through its affirmative misrepresentations and omissions, actively concealed from Plaintiffs and her physicians the true and significant risks associated with long-term FOSAMAX use. The running of any applicable statute of limitations has been tolled by reason of Defendant's fraudulent concealment.

49. As a result of Defendant's actions, Plaintiff and her prescribing physicians were unaware, and could not have reasonably known or have learned through reasonable diligence, that Plaintiff had been exposed to the risks identified in this complaint, and that those risks were the direct and proximate result of Defendant's acts, omissions, and misrepresentations.

## COUNTS

## COUNT I: PRODUCTS LIABILITY-DEFECTIVE DESIGN

50. Plaintiff repeats, reiterates, and realleges each and every allegation contained in this Complaint with the same force and effect as if fully set forth herein.

51. Defendant researched, developed, manufactured, sold, distributed, marketed, promoted and/or supplied FOSAMAX, which is defective and unreasonably dangerous, to consumers.

52. Defendant researched, developed, manufactured, sold, distributed, marketed, promoted and/or supplied FOSAMAX, which was expected to reach and did reach consumers, including Plaintiff, without substantial change in the condition in which it was manufactured and sold by Defendant.

53. Plaintiff used FOSAMAX as prescribed and in a manner normally intended, recommended, promoted, and marketed by Defendant.

54. FOSAMAX failed to perform safely when used by ordinary consumers, including Plaintiff, even when used in its intended or a reasonably foreseeable manner.

55. FOSAMAX was defective in its design and was unreasonably dangerous in that its foreseeable risks exceeded the benefits associated with its design or formulation. FOSAMAX is defective in design or formulation in that it lacks efficacy and/or it poses a greater likelihood of injury than other treatments for osteoporosis, osteopenia, or Paget's Disease.

56. Alternatively, FOSAMAX was defective in design or formulation in that its use posed a greater likelihood of injury than other available medications and was more dangerous than an ordinary consumer could reasonably foresee.  In essence, a design posing less likelihood of injury was available with a superior mechanism of action and pharmacological design.

57. Although Defendant knew, or should have known, of the defective nature of FOSAMAX, it continued to design, manufacture, market and sell FOSAMAX so as to maximize sales and profits at the expense of the public health and safety, in knowing, conscious and deliberate disregard of the foreseeable harm caused by FOSAMAX.

58. Plaintiff could not, through the exercise of reasonable care, have discovered the defects or perceived dangers of FOSAMAX.

59. As a direct and proximate consequence of Defendant's actions, omissions, and misrepresentations, Plaintiff suffered severely suppressed bone turnover and severe femur fractures as a result.  In addition, she required and will continue to require healthcare and services, and have incurred and will continue to incur medical and related expenses as a result of her injuries. Plaintiff also has suffered and will continue to suffer diminished capacity for the

12

enjoyment of life, a diminished quality of life, increased risk of premature death, aggravation of preexisting conditions and activation of latent conditions, and other losses and damages. Plaintiff's direct medical losses and costs include care for hospitalization, physician care, monitoring, treatment, medications, and supplies. Plaintiff has incurred and will continue to incur mental and physical pain and suffering and loss of wages and wage-earning capacity and other damages alleged herein.

60. In addition, Defendant's aforementioned conduct was committed with knowing conscious, wanton, willful, and deliberate disregard for the value of human life, and the rights and safety of consumers, including Plaintiff, thereby entitling Plaintiff to punitive damages so as to punish Defendant and deter it from similar conduct in the future.

**WHEREFORE**, Plaintiff demands judgment against Defendant for any and all damages, compensatory and otherwise, (including, but not limited to severe physical pain and suffering; mental anguish; severe anxiety, loss of life's pleasures; loss of enjoyment of life; medical expenses, and loss of earning capacity and income), statutory damages and punitive damages together with interest, cost of suit and counsel fees.

## COUNT II: PRODUCTS LIABILITY-FAILURE TO WARN

61. Plaintiff repeats, reiterates, and realleges each and every allegation contained in this Complaint with the same force and effect as if fully set forth herein.

62. Defendant researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce the pharmaceutical, FOSAMAX, and in the course of same, directly advertised or marketed the product to consumers or persons responsible for consumers, and therefore had a duty to warn of the risks associated with the use of FOSAMAX.

13

63. FOSAMAX was under the exclusive control of Defendant and was unaccompanied by appropriate warnings regarding the risk of severely suppressed bone turnover, resulting stress fractures, or low-energy femoral fractures and other severe and permanent injuries associated with its use. The warnings given did not accurately reflect the risk, incidence, symptoms, scope or severity of such injuries to the consumer or physicians. The promotional activities of Defendant further diluted or minimized the warnings given with the products.

64. Defendant downplayed the serious and dangerous side effects of FOSAMAX to encourage sales of the product; consequently, Defendant placed their profits above their customers' safety.

65. FOSAMAX was defective and unreasonably dangerous when it left the possession of Defendant in that it contained warnings insufficient to alert Plaintiff to the dangerous risks and reactions associated with it, including, but not limited to severely suppressed bone turnover, multiple stress fractures, and low-energy femoral fractures. Even though Defendant knew or should have known of the risks and reactions associated with FOSAMAX, it still failed to provide warnings that accurately reflected the signs, symptoms, incident, scope, or severity of the risks associated with the product.

66. Plaintiff used FOSAMAX as intended or in a reasonably foreseeable manner.

67. Plaintiff could not have discovered any defect in FOSAMAX through the exercise of reasonable care.

68. Defendant, as a manufacturer of pharmaceutical drugs, is held to the level of knowledge of an expert in the field and, further, Defendant had knowledge of the dangerous risks and side effects of FOSAMAX.

14

69. Plaintiff did not have the same knowledge as Defendant and no adequate warning was communicated to her physicians.

70. Defendant had a continuing duty to warn consumers, including Plaintiff, her physicians, and the medical community of the dangers associated with FOSAMAX, and by negligently and/or wantonly failing to adequately warn of the dangers associated with its use, Defendant breached its duty.

71. Although Defendant knew, or was reckless in not knowing, of the defective nature of FOSAMAX, it continued to design, manufacture, market, and sell FOSAMAX without providing adequate warnings and instructions concerning the use of FOSAMAX so as to maximize sales and profits at the expense of the public health and safety, in knowing, conscious, and deliberate disregard of the foreseeable harm caused by FOSAMAX.

72. Defendant deliberately concealed and/or intentionally withheld knowledge of harmful side effects from Plaintiff, her physicians, and the medical community. By so acting, Defendant acted with conscious and deliberate disregard of the foreseeable harm caused by FOSAMAX.

73. Although Defendant knew or should have known of the defective nature of FOSAMAX at the time Plaintiff consumed FOSAMAX, Defendant manipulated the post-market regulatory process so as to maximize sales and profits at the expense of the public health and safety. By so acting, Defendant acted with conscious and deliberate disregard of the foreseeable harm caused by FOSAMAX.

74. As a direct and proximate consequence of Defendant's actions, omissions, and misrepresentations, Plaintiff suffered severely suppressed bone turnover and severe femur fractures as a result. In addition, she required and will continue to require healthcare and services, and have incurred and will continue to incur medical and related expenses as a result of her

15

injuries. Plaintiff also has suffered and will continue to suffer diminished capacity for the enjoyment of life, a diminished quality of life, increased risk of premature death, aggravation of preexisting conditions and activation of latent conditions, and other losses and damages. Plaintiff's direct medical losses and costs include care for hospitalization, physician care, monitoring, treatment, medications, and supplies. Plaintiff has incurred and will continue to incur mental and physical pain and suffering and loss of wages and wage-earning capacity and other damages alleged herein.

75. In addition, Defendant's conduct in the packaging, warning, marketing, advertising, promotion, distribution, and sale of FOSAMAX was committed with knowing, conscious, willful, wanton, and deliberate disregard for the value of human life, and the rights and safety of consumers, including Plaintiff, thereby entitling Plaintiff to punitive damages so as to punish Defendant and deter it from similar conduct in the future.

**WHEREFORE**, Plaintiff demands judgment against Defendant for any and all damages, compensatory and otherwise, (including, but not limited to severe physical pain and suffering; mental anguish; severe anxiety, loss of life's pleasures; loss of enjoyment of life; medical expenses, and loss of earning capacity and income), statutory damages and punitive damages together with interest, cost of suit and counsel fees.

## COUNT III: NEGLIGENCE

76. Plaintiff repeats, reiterates, and realleges each and every allegation contained in this Complaint with the same force and effect as if fully set forth herein.

77. Defendant owed Plaintiff and other consumers a duty to exercise reasonable care when designing, manufacturing, marketing, advertising, distributing, and selling FOSAMAX.

16

78. Defendant failed to exercise due care under the circumstances and therefore breached this duty by:

a. Failing to properly and thoroughly test FOSAMAX before releasing the drug to market;

b. Failing to properly and thoroughly analyze the data resulting from the pre-marketing tests of FOSAMAX;

c. Failing to conduct sufficient post-market testing and surveillance of FOSAMAX;

d. Designing, manufacturing, marketing, advertising, distributing, and selling FOSAMAX to consumers, including Plaintiff, without an adequate warning of the significant and dangerous risks of FOSAMAX and without proper instructions to avoid the harm which could foreseeably occur as a result of using the drug;

e. Failing to exercise due care when advertising and promoting FOSAMAX; and

f. Negligently continuing to manufacture, market, advertise, and distribute FOSAMAX after Defendant knew or should have known of its adverse effects.

79. As a direct and proximate consequence of Defendant's actions, omissions, and misrepresentations, Plaintiff suffered severely suppressed bone turnover and severe femur fractures as a result. In addition, she required and will continue to require healthcare and services, and have incurred and will continue to incur medical and related expenses as a result of her injuries. Plaintiff also has suffered and will continue to suffer diminished capacity for the enjoyment of life, a diminished quality of life, increased risk of premature death, aggravation of preexisting conditions and activation of latent conditions, and other losses and damages. Plaintiff's direct medical losses and costs include care for hospitalization, physician care, monitoring, treatment, medications, and supplies. Plaintiff has incurred and will continue to incur

mental and physical pain and suffering and loss of wages and wage-earning capacity and other damages alleged herein.

80. Defendant's conduct as described above was committed with knowing, conscious, wanton, willful, and deliberate disregard for the value of human life and the rights and safety of consumers such as Plaintiff, thereby entitling Plaintiff to punitive damages so as to punish Defendant and deter it from similar conduct in the future.

**WHEREFORE**, Plaintiff demands judgment against Defendant for any and all damages, compensatory and otherwise, (including, but not limited to severe physical pain and suffering; mental anguish; severe anxiety, loss of life's pleasures; loss of enjoyment of life; medical expenses, and loss of earning capacity and income), statutory damages and punitive damages together with interest, cost of suit and counsel fees.

## COUNT IV: STRICT LIABILITY

81. Plaintiff repeats, reiterates, and realleges each and every allegation contained in this Complaint with the same force and effect as if fully set forth herein.

82. Defendant manufactured, sold, distributed, marketed, and/or supplied FOSAMAX in a defective and unreasonably dangerous condition to consumers, including Plaintiff.

83. Defendant designed, manufactured, sold, distributed, supplied, marketed, and/or promoted FOSAMAX, which was expected to reach and did in fact reach consumers, including Plaintiff, without substantial change in the condition in which it was manufactured and sold by Defendant.

84. Plaintiff used FOSAMAX as prescribed and in a manner normally intended, recommended, promoted, and marketed by Defendant.

85. FOSAMAX failed to perform safely when used by ordinary consumers, including Plaintiff, including when they were used as intended and in a reasonably foreseeable manner.

86. FOSAMAX was defective in its design and was unreasonably dangerous in that its unforeseeable risks exceeded the benefits associated with its design or formulation.

87. FOSAMAX was defective in design or formulation in that it posed a greater likelihood of injury than other similar medications and was more dangerous than an ordinary consumer could reasonably foresee or anticipate.

88. FOSAMAX was defective in its design and was unreasonably dangerous in that it neither bore nor was packaged with nor accompanied by warnings adequate to alert consumers, including Plaintiff, of the risks described herein, including, but not limited to, the risk of severely suppressed bone turnover, brittle bones, stress fractures, or low-energy femoral fractures.

89. Although Defendant knew or should have known of the defective nature of FOSAMAX, it continued to design, manufacture, market, and sell FOSAMAX so as to maximize sales and profits at the expense of the public health and safety. By so acting, Defendant acted with conscious and deliberate disregard of the foreseeable harm caused by FOSAMAX.

90. Neither Plaintiff nor her prescribing physician could through the exercise of reasonable care, have discovered FOSAMAX defects or perceived the dangers posed by the drug.

91. As a direct and proximate consequence of Defendant's actions, omissions, and misrepresentations, Plaintiff suffered severely suppressed bone turnover and severe femur fractures as a result. In addition, she required and will continue to require healthcare and services, and have incurred and will continue to incur medical and related expenses as a result of her injuries. Plaintiff also has suffered and will continue to suffer diminished capacity for the enjoyment of life, a diminished quality of life, increased risk of premature death, aggravation of

19

preexisting conditions and activation of latent conditions, and other losses and damages. Plaintiff's direct medical losses and costs include care for hospitalization, physician care, monitoring, treatment, medications, and supplies. Plaintiff has incurred and will continue to incur mental and physical pain and suffering and loss of wages and wage-earning capacity and other damages alleged herein.

92. Defendant's conduct as described above was committed with knowing, conscious, wanton, willful, and deliberate disregard for the value of human life and the rights and safety of consumers such as Plaintiff, thereby entitling Plaintiff to punitive damages so as to punish Defendants and deter it from similar conduct in the future.

**WHEREFORE**, Plaintiff demands judgment against Defendant for any and all damages, compensatory and otherwise, (including, but not limited to severe physical pain and suffering; mental anguish; severe anxiety, loss of life's pleasures; loss of enjoyment of life; medical expenses, and loss of earning capacity and income), statutory damages and punitive damages together with interest, cost of suit and counsel fees.

## COUNT V: BREACH OF EXPRESS WARRANTY

93. Plaintiff repeats, reiterates, and realleges each and every allegation contained in this Complaint with the same force and effect as if fully set forth herein.

94. Defendant expressly represented to Plaintiff, her physician, other consumers and the medical community that FOSAMAX was safe and fit for its intended purposes, that they were of merchantable quality, that they did not produce any dangerous side effects, and that they were adequately tested.

95. Defendant marketed FOSAMAX as being effective for the treatment and prevention of osteoporosis and the prevention of fractures in women with osteoporosis or osteopenia.

96. FOSAMAX does not conform to Defendant's express representations because it is not safe, has numerous and serious side effects, and causes severe and permanent injuries, including but not limited to severely suppressed bone turnover, brittle bones and low-energy femoral fractures.

97. At all relevant times FOSAMAX did not perform as safely as an ordinary consumer would expect, when used as intended or in a reasonably foreseeable manner.

98. Plaintiff, her physicians, other consumers, and the medical community relied upon Defendant's express warranties.

99. As a direct and proximate consequence of Defendant's actions, omissions, and misrepresentations, Plaintiff suffered severely suppressed bone turnover and severe femur fractures as a result. In addition, she required and will continue to require healthcare and services, and have incurred and will continue to incur medical and related expenses as a result of her injuries. Plaintiff also has suffered and will continue to suffer diminished capacity for the enjoyment of life, a diminished quality of life, increased risk of premature death, aggravation of preexisting conditions and activation of latent conditions, and other losses and damages. Plaintiff's direct medical losses and costs include care for hospitalization, physician care, monitoring, treatment, medications, and supplies. Plaintiff has incurred and will continue to incur mental and physical pain and suffering and loss of wages and wage-earning capacity and other damages alleged herein.

100. Defendant's conduct as described above was committed with knowing, conscious, wanton, willful, and deliberate disregard for the value of human life and the rights and safety of consumers such as Plaintiff, thereby entitling her to punitive damages as to punish Defendant and deter it from similar conduct in the future.

**WHEREFORE**, Plaintiff demands judgment against Defendant for any and all damages, compensatory and otherwise, (including, but not limited to severe physical pain and suffering; mental anguish; severe anxiety, loss of life's pleasures; loss of enjoyment of life; medical expenses, and loss of earning capacity and income), statutory damages and punitive damages together with interest, cost of suit and counsel fees.

## COUNT VI: BREACH OF IMPLIED WARRANTY

101. Plaintiff repeats, reiterates, and realleges each and every allegation contained in this Complaint with the same force and effect as if fully set forth herein.

102. Defendant manufactured, distributed, advertised, promoted, and sold FOSAMAX.

103. At all times, Defendant knew of the use for which FOSAMAX was intended and impliedly warranted the product to be of merchantable quality and safe and fit for such use.

104. Defendant was aware that consumers, including Plaintiff, would use FOSAMAX for treatment and prevention of osteoporosis and for other purposes.

105. Plaintiff, her physicians, and the medical community reasonably relied upon the judgment and sensibility of Defendant to sell FOSAMAX only if it was indeed of merchantable quality and safe and fit for its intended use.

106. Defendant breached its implied warranty to consumers, including Plaintiff; FOSAMAX was not of merchantable quality or safe and fit for its intended use.

107. Consumers, including Plaintiff, her physicians and the medical community, reasonably relied upon Defendant's implied warranty for FOSAMAX.

108. FOSAMAX reached consumers without substantial change in the condition in which it was manufactured and sold by Defendant.

22

109. As a direct and proximate consequence of Defendant's actions, omissions, and misrepresentations, Plaintiff suffered severely suppressed bone turnover and severe femur fractures as a result. In addition, she required and will continue to require healthcare and services, and have incurred and will continue to incur medical and related expenses as a result of her injuries. Plaintiff also has suffered and will continue to suffer diminished capacity for the enjoyment of life, a diminished quality of life, increased risk of premature death, aggravation of preexisting conditions and activation of latent conditions, and other losses and damages. Plaintiff's direct medical losses and costs include care for hospitalization, physician care, monitoring, treatment, medications, and supplies. Plaintiff has incurred and will continue to incur mental and physical pain and suffering and loss of wages and wage-earning capacity and other damages alleged herein.

110. Defendant's conduct as described above was committed with knowing, conscious, wanton, willful, and deliberate disregard for the value of human life and the rights and safety of consumers such as Plaintiff, thereby entitling Plaintiff to punitive damages so as to punish Defendant and deter it from similar conduct in the future.

**WHEREFORE,** Plaintiff demands judgment against Defendant for any and all damages, compensatory and otherwise, (including, but not limited to severe physical pain and suffering; mental anguish; severe anxiety, loss of life's pleasures; loss of enjoyment of life; medical expenses, and loss of earning capacity and income), statutory damages and punitive damages together with interest, cost of suit and counsel fees.

## COUNT VII: FRAUDULENT MISREPRESENTATION

111. Plaintiff repeats, reiterates, and realleges each and every allegation contained in this Complaint with the same force and effect as if fully set forth herein.

112. Defendant made fraudulent misrepresentations with respect to FOSAMAX in the following particulars:

    a. Defendant represented through its labeling, advertising, marketing materials, detail persons, seminar presentations, publications, notice letters, and regulatory submissions that FOSAMAX had been tested and found to be safe and effective for the treatment and prevention of osteoporosis and Paget's disease;

    b. Defendant represented that FOSAMAX was safer than other alternative medications and treatments; and

    c. Defendant represented that FOSAMAX was a pill which would prevent rather than induce osteoporotic fractures.

113. Defendant knew that its representations were false, yet it willfully, wantonly, and recklessly disregarded its obligation to provide truthful representations regarding the safety and risk of FOSAMAX to consumers, including Plaintiff, her physicians and the medical community.

114. The representations were made by Defendant with the intent that doctors and patients, including Plaintiff and her physicians, rely upon them.

115. Defendant's representations were made with the intent of defrauding and deceiving Plaintiff, her physicians, other consumers, and the medical community to induce and encourage the sale of FOSAMAX.

116. Plaintiff, her physicians, and others relied upon the representations.

117. Defendant's fraudulent representations evinced its callous, reckless, willful, and depraved indifference to the health, safety, and welfare of consumers, including Plaintiff.

118. As a direct and proximate consequence of Defendant's actions, omissions, and misrepresentations, Plaintiff suffered severely suppressed bone turnover and severe femur

24

fractures as a result. In addition, she required and will continue to require healthcare and services, and have incurred and will continue to incur medical and related expenses as a result of her injuries. Plaintiff also has suffered and will continue to suffer diminished capacity for the enjoyment of life, a diminished quality of life, increased risk of premature death, aggravation of preexisting conditions and activation of latent conditions, and other losses and damages. Plaintiff's direct medical losses and costs include care for hospitalization, physician care, monitoring, treatment, medications, and supplies. Plaintiff has incurred and will continue to incur mental and physical pain and suffering and loss of wages and wage-earning capacity and other damages alleged herein.

119. Defendant's conduct as described above was committed with knowing, conscious, wanton, willful, and deliberate disregard for the value of human life and the rights and safety of consumers such as Plaintiff, thereby entitling Plaintiff to punitive damages so as to punish Defendant and deter it from similar conduct in the future.

**WHEREFORE**, Plaintiff demands judgment against Defendant for any and all damages, compensatory and otherwise, (including, but not limited to severe physical pain and suffering; mental anguish; severe anxiety, loss of life's pleasures; loss of enjoyment of life; medical expenses, and loss of earning capacity and income), statutory damages and punitive damages together with interest, cost of suit and counsel fees.

## COUNT VIII: PUNITIVE DAMAGES

120. Plaintiff repeats, reiterates, and realleges each and every allegation contained in this Complaint with the same force and effect as if fully set forth herein.

121. Upon information and belief, Defendant has marketed its drugs in an unacceptable manner and not in accordance with FDA regulations.

25

122. In fact, Defendant Merck has been repeatedly admonished by the FDA for overstating the superiority in reducing fractures, making misleading comments about menopause as a cause of osteoporosis, and overstating the risks and minimizing the benefits of FOSAMAX in its communications to consumers and physicians.

123. In addition to the above, Defendant has repeatedly avoided FDA recommendations as to which warnings relating to public hazards should be included in materials. Defendant has engaged in other similar incidents with other drugs it sells as evidence of a pattern and practice of overstating risks and minimizing benefits.

124. Defendant's acts were willful and malicious in that Defendant's conduct was carried on with a conscious disregard for the safety and rights of Plaintiff. Defendant's unconscionable conduct thereby warrants an assessment of exemplary and punitive damages against Defendant in an amount appropriate to punish Defendant, and deter similar conduct in the future.

**WHEREFORE**, Plaintiff prays for judgment against Defendant, as follows:

a. For general and compensatory damages in an amount to be proven at the time of trial;

b. For special damages in an amount to be proven at the time of trial;

c. For statutory damages as set forth above, in an amount to be proven at the time of trial;

d. For exemplary and punitive damages in an amount to be proven at the time of trial, and sufficient to punish Defendant or to deter Defendant and others from repeating the injurious conduct alleged herein;

e. For pre-judgment and post-judgment interest on the above general and special damages;

f. For costs of this suit and attorneys' fees; and

g. All other relief that this Court deems necessary, proper, and just.

## **DEMAND FOR JURY TRIAL**

Demand is hereby made for a trial by jury.

By:   /s/ *Hong Jiang*

Hong Jiang
*Pro Se Plaintiff*

715 Paisley Dr.
Colorado Springs, CO 80906
719-210-6122 cell